UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| THE SWEETBRIDGE GROUP, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>ROBINSON & COLE, LLP,<br><br>Defendant. | 4:21-CV-04138-KES<br><br>ORDER GRANTING MOTION TO DISMISS AND MOTION TO TRANSFER |

Plaintiff, The Sweetbridge Group, LLC, brought suit against defendant, Robinson & Cole LLP, alleging breach of contract, tortious interference, and defamation. Docket 4. Robinson moves under Federal Rule of Civil Procedure 12(b)(2) to dismiss for lack of personal jurisdiction. Docket 5. Sweetbridge opposes the motion to dismiss and alternatively moves to transfer the case to the District of Connecticut if the motion to dismiss is granted. Docket 10; Docket 12. For the following reasons, the court grants the motion to dismiss and grants the motion to transfer.

**BACKGROUND**

Sweetbridge is a legal recruiting company that works with law firms seeking a merger or acquisition with other firms. Docket 4 ¶¶ 6-7. Sweetbridge is a South Dakota corporation with its principal place of business in Sioux Falls, South Dakota. *Id.* ¶ 1; Docket 11 ¶¶ 2-3. Sweetbridge is owned by Kimberly Stockinger. Docket 11 ¶ 1. Robinson, a law firm, is a Connecticut limited liability partnership with its principal place of business in Connecticut. Docket 8 ¶¶ 3-4. This lawsuit

stems from the alleged breach of an agreement between Sweetbridge and Robinson regarding Sweetbridge's assistance in identifying law firms for Robinson to merge with or acquire. *See* Docket 7 ¶ 18; Docket 8 ¶ 33. The only individuals who interacted during the parties' relationship were Stockinger on behalf of Sweetbridge and Michael Orce and Stephen Goldman on behalf of Robinson. Docket 8 ¶¶ 16-17; Docket 7 ¶ 8; Docket 11 ¶ 13. Orce is Robinson's chief operating officer; Goldman was Robinson's managing partner from 2016 through March 2021 and he continues to serve as chair of the firm's Growth Committee. Docket 8 ¶ 2; Docket 7 ¶ 6.

The majority of Robinson's attorneys and staff work in the firm's Connecticut offices. Docket 8 ¶ 4. Robinson also has offices in California, Delaware, Florida, Massachusetts, New York, Pennsylvania, and Rhode Island. *Id.* ¶ 5. Robinson has never had an office in South Dakota. *Id.* ¶ 6. No lawyer at Robinson is licensed to practice in state or federal court in South Dakota. *Id.* ¶ 7. Only one Robinson attorney has ever been admitted *pro hac vice* in South Dakota; that admission occurred in 2005, and the attorney retired from Robinson before the events in this lawsuit. *Id.* ¶ 8. Robinson has never employed any individuals located in South Dakota, and it has never appointed an agent for service of process or any other purpose in the state. *Id.* ¶¶ 9-10. Robinson has never owned real property or automobiles in South Dakota, and it has never advertised or registered in the state. *Id.* ¶¶ 11-13. Robinson does not pay any taxes in South Dakota. *Id.* ¶ 14. From 2016 to the present, less than 0.07% of the firm's gross annual revenue came from clients with a South Dakota billing address. *Id.* ¶ 15. Robinson did not perform any work for those clients in South Dakota. *Id.* And none of those

2

clients are in any way involved with or related to this lawsuit. *Id.* Robinson has never solicited any law firm in South Dakota for merger or acquisition. Docket 7 ¶ 17; Docket 8 ¶ 32.

On March 25, 2021, Stockinger sent an email to Orce's personal email address—not his Robinson email address—and inquired if he would be interested in a position with a law firm in New York City. Docket 8 ¶ 24; Docket 11 ¶ 4. This was the first time Orce had heard of and had contact with Sweetbridge. Docket 8 ¶ 24. Orce and Stockinger discussed the purpose of her initial email as well as Robinson's growth strategy over email. *Id.* ¶ 25; Docket 11 ¶ 7. Later, Orce invited Stockinger to contact him at his Robinson email address to further discuss Robinson's growth strategy. Docket 11-1 at 1. On April 14, 2021, Stockinger emailed Orce at his Robinson email address and asked if they could talk by phone about Robinson's mergers and acquisitions plans. Docket 8 ¶ 25; Docket 11 ¶ 12. On April 21, 2021, Stockinger sent Orce a draft agreement for Sweetbridge to render merger and acquisition prospecting services for Robinson. Docket 8 ¶ 26. Throughout April 2021, Orce and Stockinger negotiated the terms of the agreement. *Id.* ¶ 27. Orce negotiated and finalized the agreement from Connecticut. *Id.* ¶¶ 27-28. The final agreement was prepared on Sweetbridge's letterhead, but it did not include a physical address for Sweetbridge or in any way indicate that Sweetbridge is a South Dakota company. *Id.* ¶ 29. The agreement did not include choice of laws or forum selection provisions, and it did not include any reference to South Dakota. *Id.*

Under the parties' agreement, Sweetbridge was to introduce prospective law firms for merger or acquisition to Robinson. Docket 4 ¶ 9. Robinson was to pay

Sweetbridge a commission if an introduction resulted in a merger or acquisition. *Id.* ¶ 10. The agreement stated that "[a prospective] Firm's introduction is confidential. [Robinson] shall not refer or identify [a prospective] Firm to any other company or firm." *Id.* ¶ 11 (second alteration in original). Sweetbridge provided Robinson with the names of three law firms that were seeking to be acquired, none of which were located in South Dakota. *Id.* ¶ 14; Docket 8 ¶ 33; Docket 7 ¶ 18. After Sweetbridge disclosed the names of the three firms, Robinson allegedly approached a Sweetbridge competitor and disclosed the three firms' names in violation of the agreement. Docket 4 ¶¶ 15-16. Sweetbridge notified Robinson that it had breached the agreement, and Robinson terminated the agreement. *Id.* ¶ 17.

The parties dispute whether Robinson had knowledge that Sweetbridge was registered in or connected to South Dakota in any way. *Compare* Docket 8 ¶¶ 34-35 *with* Docket 11 ¶ 6. Both Goldman and Orce believed through their communication with Stockinger that she was located in California. Docket 7 ¶ 13; *see* Docket 8 ¶ 22. Orce claims that Stockinger never told him that she resided in South Dakota or that Sweetbridge was a South Dakota corporation. Docket 8 ¶ 34. Orce and Goldman claim that Stockinger never mentioned South Dakota in any conversation or correspondence, and they did not know that Stockinger or Sweetbridge had any connection to South Dakota until this lawsuit was filed. *Id.* ¶¶ 34-35. But Stockinger claims that she told Orce that she lived in South Dakota during one of their earliest conversations and they had "multiple discussions" about the state's politics and weather. Docket 11 ¶ 6. And she claims that Orce and Goldman "were aware that [she] was in South Dakota due to statements that

4

[she] made." *Id.* ¶ 14. Stockinger states that Orce and Goldman "told [her] they would not be interested in a South Dakota [law firm] location." *Id.* ¶ 15.

Orce and Goldman communicated from Connecticut with Stockinger by phone call, text message, and email. Docket 8 ¶ 18; Docket 7 ¶ 9. In total, the parties exchanged 164 emails, 8 phone calls, and 12 text messages. Docket 11 ¶ 16. Stockinger states that she was in South Dakota during all of her communication with Orce and Goldman. *Id.* Neither Orce or Goldman traveled to South Dakota to meet with Stockinger, and Robinson never sent Sweetbridge any payments to a South Dakota address or any other address. Docket 8 ¶ 31; Docket 7 ¶ 16. Neither Orce nor Goldman visited any website belonging to Sweetbridge, and they believe that Sweetbridge did not maintain a website. Docket 8 ¶ 21; Docket 7 ¶ 12. According to Orce and Goldman, none of the emails they received from Stockinger included a physical address or referenced South Dakota in any way. Docket 8 ¶ 19. Some of Stockinger's emails included a signature block that included Stockinger's name, Sweetbridge's name, and a telephone number with a 415 area code believed to be assigned to parts of California. Docket 8 ¶ 19; Docket 7 ¶ 10; *see* Docket 11-1 at 2. Her signature block also included the following text: "Member of National Association of Legal Search Consultants (NALSC)" and "For more information find me on LinkedIn." Docket 11-1 at 2. Other emails from Stockinger included no signature block or identifying information other than her name. Docket 7 ¶ 10.

At the time Orce visited Stockinger's LinkedIn page, it featured a picture of the Golden Gate Bridge and indicated that Stockinger was located in San Francisco, California. Docket 8 ¶ 22; *see* Docket 8-1 at 2 (showing a date stamp of

August 11, 2021, on the LinkedIn profile screenshot); *see also* Docket 11-3 at 1 ("a more complete screenshot" Stockinger provided of her LinkedIn profile). Stockinger's LinkedIn profile states that she was a board member of Sioux Falls CASA from 2009 to 2012 and a volunteer with Sioux Falls Jazz & Blues from 2008 to 2015. Docket 11-3 at 4. "South Dakota" does not appear anywhere on her LinkedIn profile. *See* Docket 11-3. No location is listed next to her work experience with the Sweetbridge group; past job experiences identify locations in Phoenix, Arizona, and the San Francisco Bay Area. Docket 11-3 at 3.

Stockinger points out that her membership profile on the National Association of Legal Search Consultants states that Sweetbridge is located at a street address in Sioux Falls, South Dakota. Docket 11 ¶ 28; Docket 11-2 at 1. And she notes that her profile on the Association's website is searchable in the online membership directory. Docket 11 ¶ 27.

Sweetbridge filed its complaint against Robinson on August 10, 2021, alleging breach of contract and tortious interference. *See* Docket 1. The day after the complaint was filed, Robinson received a request from Law360 and Thomson Reuters for comment regarding Sweetbridge's allegations. Docket 8 ¶ 36. Robinson's response stated:

> We are executing our Strategic Plan which calls, in part, for growth through combinations with smaller firms and groups that offer strategic advantage through their practices and/or locations. The recruiting relationship that gave rise to this lawsuit was part of that initiative. This suit followed our termination of the firm's relationship with [Sweetbridge] and our retention of another recruiting firm. We strongly contest the allegations in the complaint and will defend the matter aggressively.

6

*Id.* ¶ 37. Reuters published an article on August 11, 2021, regarding this lawsuit. Docket 4 ¶ 37. That same day, Robinson received a request for comment from USA Today and responded:

> We are executing our Strategic Plan which calls, in part, for growth through combinations with smaller firms and groups that offer strategic advantage through their practices and/or locations. As part of that initiative, we engaged [Sweetbridge] which identified three firms that we considered. None were viable opportunities. We later engaged a different recruiter to explore opportunities with different firms. This lawsuit followed our termination of our relationship with the plaintiff and our retention of that other recruiting firm. We strongly contest the allegations in the complaint and will defend the matter aggressively.

Docket 8 ¶ 39. On August 11, 2021, Reuters.com published an article regarding Sweetbridge's lawsuit against Robinson. Docket 4 ¶ 37. An article in the Sioux Falls Argus Leader followed on August 12, 2021. *Id.* ¶ 38. In both articles, a Robinson representative was quoted saying "This suit followed our termination of the firm's relationship with the Sweetbridge Group and our retention of another recruiting firm." *Id.* ¶ 39. Sweetbridge alleges that Robison's statements falsely imply that Sweetbridge filed suit in retaliation for Robinson's decision to terminate the parties' contract. *Id.* ¶ 40. Robinson did not communicate with the Argus Leader or any other media outlets in South Dakota regarding this lawsuit. Docket 8 ¶ 40.

On August 16, 2021, Sweetbridge filed an amended complaint that added a cause of action for defamation in addition to the breach of contract and tortious interference claims in the initial complaint. Docket 4 at 3-4. In the amended complaint, Sweetbridge asserts that venue in the District of South Dakota is proper, "because, among other reasons, Sweetbridge performed its contractual obligations in South Dakota." *Id.* ¶ 5.

7

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss a claim for lack of personal jurisdiction. "To survive a motion to dismiss, a plaintiff need make only a prima facie case that personal jurisdiction exists." *Downing v. Goldman Phipps, PLLC*, 764 F.3d 906, 911 (8th Cir. 2014) (citing *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.,* 65 F.3d 1427, 1431 (8th Cir. 1995)). But when personal jurisdiction is challenged by a defendant's affidavits and motions, the plaintiff bears the burden of proving jurisdiction by the same means, not mere allegations of the complaint. *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072-73 (8th Cir. 2004). The court "look[s] at the facts in the light most favorable to the nonmoving party and resolve[s] all factual conflicts in favor of that party." *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 646-47 (8th Cir. 2003) (citing *First Nat. Bank of Lewisville v. First Nat Bank of Clinton*, 258 F.3d 727, 729 (8th Cir. 2001) (applying that standard when the court does not hold an evidentiary hearing on a motion to dismiss for lack of personal jurisdiction)).

**DISCUSSION**

**I.      Motion to Dismiss for Lack of Personal Jurisdiction**

Personal jurisdiction of federal courts is ordinarily determined by the law of the state where the court is located. *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). South Dakota law specifies that a person is subject to jurisdiction of state courts through "any act, the basis of which is not inconsistent with the Constitution . . . ." SDCL § 15-7-2(14). Thus, the relevant inquiry is whether the exercise of South Dakota's long-arm statute to impose this court's jurisdiction comports with federal due process. *See id.* Due process requires a defendant have

8

"certain minimum contacts with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Mayer*, 311 U.S. 457, 463 (1940)).

The Supreme Court has recognized two types of personal jurisdiction: "general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). General jurisdiction is established when a defendant is "essentially at home" in the state. *Id.* A corporation's place of incorporation and principal place of business are "paradigm" forums where general jurisdiction applies. *Id.* "General jurisdiction . . . extends to 'any and all claims' brought against a defendant" where the defendant is at home, and "[t]hose claims need not relate to the forum State or the defendant's activity there." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

Robinson argues that it is not subject to this court's personal jurisdiction, whether under general or specific personal jurisdiction. Docket 6 at 6, 10. Sweetbridge concedes that the court does not have general personal jurisdiction over Robinson. Docket 10 at 1 n.1. Robinson is incorporated and has its principal place of business in Connecticut, thus it is "at home" in Connecticut and subject to general personal jurisdiction there, not South Dakota. *See Ford Motor Co.*, 141 S. Ct. at 1024. The court finds it does not have general personal jurisdiction over Robinson and proceeds to address the parties' specific jurisdiction arguments.

Specific jurisdiction covers a narrower class of claims and requires the defendant to take "some act by which [it] purposefully avails itself of the privilege

9

of conducting activities within the forum State." *Id.* (alteration in original) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "The conduct and connection with the forum state must be such that the defendant could reasonably anticipate being haled into court there." *Whaley v. Esebag*, 946 F.3d 447, 451 (8th Cir. 2020) (cleaned up). "The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.' " *Ford Motor Co.*, 141 S. Ct. at 1025 (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984)). The contacts must show that the defendant engaged in deliberate activity to exploit the forum state's market or enter a contractual relationship centered in the forum state. *Id.* (citing *Walden v. Fiore*, 571 U.S. 277, 285 (2014)). There needs to be a showing that the plaintiff's claims " 'arise out of or relate to the defendant's contacts' with the forum." *Id.* (*quoting Bristol-Myers Squibb Co. v. Superior Ct.*, 137 S. Ct. 1773, 1780 (2017)).

The Eighth Circuit employs a five-factor, totality of the circumstances test to determine whether specific jurisdiction exists. *Kaliannan v. Liang*, 2 F.4th 727, 733 (8th Cir. 2021). Under that test, the court analyzes: "(1) the nature and quality of [defendant's] contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." *Id.* (alteration in original) (quoting *Whaley*, 946 F.3d at 452). The first three factors are of "primary importance," while the last two "carry less weight and are not dispositive." *Id.*

When a claim involves an alleged breach of contract, the court first examines "the role of contracts in the personal jurisdiction analysis" before it considers the five factors. *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 821

10

(8th Cir. 2014) (citing *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 593 (8th Cir. 2011)). "A contract between a plaintiff and an out-of-state defendant is not sufficient in and of itself to establish personal jurisdiction over the defendant in the plaintiff's forum state." *Id.* (quoting *K-V Pharm.*, 648 F.3d at 593). "Personal jurisdiction . . . does not turn on mechanical tests or on conceptualistic theories of the place of contracting or of performance." *Id.* (quoting *K-V Pharm.*, 648 F.3d at 593). The court should consider all the factors surrounding the contract, such as prior negotiations, the actual course of dealings, the terms of the contract, and its contemplated future consequences. *K-V Pharm. Co.*, 648 F.3d at 593.

### A. The Parties' Contract

The court begins by considering the contract between Sweetbridge and Robinson. Robinson argues that South Dakota was irrelevant to its contract with Sweetbridge. Docket 6 at 11-12. Sweetbridge claims that the court has personal jurisdiction over Robinson because Robinson knew it was engaging a South Dakota company before and at the time the parties entered into their contract. Docket 10 at 5.

When analyzing the parties' contract, *Fastpath, Inc. v. Arbela Technologies Corporation* is instructive. There, an Iowa plaintiff brought suit for breach of contract against a California defendant in an Iowa court. *Fastpath*, 760 F.3d at 819. Defendant moved to dismiss for lack of personal jurisdiction, and the district court granted the motion. *Id.* at 818. In its analysis of the parties' contract, the Eighth Circuit Court of Appeals noted that the contract contained an Iowa choice-of-law provision but held that such a provision is not determinative and is insufficient on its own to confer personal jurisdiction. *Id.* at 821. The court also

11

found that the contract "did not require performance or contemplate future consequences specifically in Iowa." *Id.* at 822. And the court considered that the defendant never traveled to Iowa as part of the agreement, had no employees or offices in Iowa, and allegedly breached the contract outside of Iowa. *Id.* Under these facts, the court concluded that the parties' contract did not weigh in favor an Iowa court's jurisdiction over the non-resident defendant. *Id.*

Here, Sweetbridge's contract with Robinson has even fewer connections to a specific state than in *Fastpath*, because the contract did not contain a choice-of-law provision designating South Dakota or any other forum. *See* Docket 8 ¶ 29. No part of the contract specifically required performance in South Dakota. *See id.* The contract did not expressly contemplate any future consequences of the contract occurring in South Dakota, and during the parties' negotiations Orce and Goldman indicated that Robinson was not interested in a merger or acquisition with a South Dakota law firm. *See* Docket 11 ¶ 15. In fact, "South Dakota" does not appear once in the contract. Docket 8 ¶ 29. No one representing Robinson traveled to South Dakota leading up to and in performance of the contract. *Id.* ¶ 31. And nothing in the affidavits provided by either party suggests that Robinson's alleged breach of contract occurred in South Dakota. "That [a South Dakota] company felt its breach does not mean that [a South Dakota] court has jurisdiction over the non-resident defendant consistent with due process." *See Fastpath*, 760 F.3d at 822.

Sweetbridge argues that the contract *does* contemplate future consequences in South Dakota, because had it been successful in securing a merger or acquisition for Robinson, Robinson would have sent payment to South Dakota.

12

Docket 10 at 5. Sweetbridge claims that "[i]t is not relevant that [Robinson's alleged] breach and subsequent termination of the contract prevented the completion of all the acts contemplated by the contract." *Id.* at 5 n.2. But this argument assumes that the contract actually contemplates the manner of future payment. But the affidavits before the court, including Stockinger's, do not support this argument.[1] Neither party avers that the agreement in any way addressed where Robinson would send payment. And because the agreement never mentions South Dakota in any context, the court finds that the agreement did not contemplate future payments to South Dakota. *See Burger King Corp. v. Rudezewicz*, 471 U.S. 462, 479 (1985) (recognizing that, under a contract, "future consequences . . . are the real object of the business transaction" (citation omitted)). Thus, the contract and the facts surrounding it do not show that Robinson purposefully availed itself of personal jurisdiction in South Dakota.

### B. The Five Specific Jurisdiction Factors

The court now turns to the Eighth Circuit's five factors to evaluate personal jurisdiction: (1) the nature and quality of the defendant's contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties. *Kaliannan*, 2 F.4th at 733. Robinson argues that all five factors weigh against finding that the court has personal jurisdiction over this suit. Docket 6 at 14-23. Sweetbridge's response focuses largely on its

---

[1] Neither party submitted the disputed contract as an exhibit. Thus, the court relies on the statements in their affidavits of relevant provisions in the contract and resolves all factual dispute in favor of Sweetbridge, the non-movant. *Epps*, 327 F.3d at 646-47.

argument that Orce and Goldman "were aware that Sweetbridge was a South Dakota company and that its principal was a South Dakota resident throughout negotiations," an argument seemingly directed toward the first factor. *See* Docket 10 at 3-5.

The Eighth Circuit in *Fastpath*, relying on *Walden v. Fiore*, addressed plaintiff's argument that the court could exercise personal jurisdiction over the non-resident defendant because the defendant knew that plaintiff was an Iowa corporation. *Fasthpath*, 760 F.3d at 823-24. In *Walden*, the Supreme Court held that Nevada lacked personal jurisdiction over a non-resident defendant even though the defendant knew that the plaintiffs were Nevada residents, because none of the conduct at issue took place in Nevada. 571 U.S. at 288. Similarly, in *Fastpath* the court held that even if the defendant knew plaintiff was an Iowa corporation, defendant's "contacts with Iowa were merely 'incidental' and did 'not constitute a deliberate and substantial connection with the state such that [defendant] could reasonably anticipate being haled into court there.' " *Fastpath*, 760 F.3d at 824 (quoting *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 594 (8th Cir. 2011)). "To find otherwise would 'improperly attribute[] a plaintiff's forum connections to the defendant and make[] those connections decisive in the jurisdictional analysis.' " *Id.* at 823 (quoting *Walden*, 571 U.S. at 289). In other words, "the plaintiff cannot be the only link between the defendant and the forum." *Id.* (quoting *Walden*, 571 U.S. at 285).

Here, Sweetbridge argues that Robinson was "aware that Sweetbridge was a South Dakota company and that [Stockinger] was a South Dakota resident throughout negotiations." Docket 10 at 3. But Stockinger's affidavit only supports

14

the latter part of the argument. That is, Stockinger told Orce and Goldman that she "lived in South Dakota" and they knew that she was "in South Dakota" during their communications. Docket 11 ¶¶ 6, 14. Those facts only establish Stockinger's location, not Sweetbridge's residency. Regarding Robinson's knowledge of Sweetbridge's residency, Sweetbridge merely suggests that Robinson *should have* or *could have* discovered that Sweetbridge was a South Dakota company, not that it actually knew this information. *See* Docket 10 at 4-5. And even if Robinson knew that Sweetbridge was a South Dakota company, knowledge of a plaintiff's state of residency is insufficient on its own for the court to exercise jurisdiction over a non-resident defendant. *See Fastpath*, 760 F.3d at 823; *Walden*, 571 U.S. at 289.

Under the first factor, the court looks to the nature and quality of Robinson's contacts with South Dakota, the forum state. Robinson through Orce and Goldman, and Sweetbridge through Stockinger, communicated exclusively by phone and email. Orce and Goldman contacted Stockinger from Connecticut while Stockinger was located in South Dakota. The phone number Orce and Goldman used to contact Stockinger had a California area code. Her LinkedIn page referenced in her email signature indicated that she was located in San Francisco. Nothing in Stockinger's emails to Orce and Goldman indicated that Sweetbridge was a South Dakota company. No one from Robinson ever visited South Dakota related to the parties' contract. Robinson has never directed advertising, designated an agent for service, or provided legal services in South Dakota. The court finds that the nature and quality of Robinson's contacts with South Dakota were not Robinson's own choice, but rather the "fortuitous" result of Sweetbridge's

15

agent, Stockinger, residing in South Dakota. *See Ford Motor Co.*, 141 S. Ct. at 1025. Thus, the first factor does not weigh in favor of the court's personal jurisdiction over Robinson.

Under the second factor, the court considers the quantity of Robinson's contacts with the forum state. Stockinger points to the 164 emails, 8 phones calls, and 12 text messages, and suggests that those quantities create a substantial connection between Robinson and South Dakota. *See* Docket 10 at 5; Docket 11 ¶ 16. But as the court discussed under factor one, these contacts, however numerous, do not show that Robinson sought to deliberately exploit South Dakota's market or enter a contractual relationship centered in South Dakota. *See Ford Motor Co.*, 141 S. Ct. at 1025. At most, Robinson made numerous contacts from Connecticut with Sweetbridge's agent who happened to live in South Dakota without knowing that Sweetbridge was a South Dakota corporation. The quantity of contacts with Stockinger do not show that Robinson sought to create a "substantial connection" with South Dakota. *See Fastpath*, 760 F.3d at 824 (quoting *Viasystems, Inc.* 646 F.3d at 593).

Under the third factor, the court considers the relation of the causes of action to Robinson's contact with South Dakota. As discussed above, Sweetbridge's claims for breach of contract and tortious interference bear little to no relation to South Dakota. Under the contract, Sweetbridge was to seek law firms for merger or acquisition outside of South Dakota. Robinson had no prior or existing relationship with South Dakota, and it appears that Robinson allegedly breached the contract somewhere other than South Dakota. Thus, as to the first

16

two causes of action, this factor does not weigh in favor of the court's personal jurisdiction over Robinson.

Sweetbridge argues that its defamation claim "creates a unique connection between [Robinson] and the forum that does not exist with other causes of action[.]" Docket 10 at 6. Sweetbridge relies on *Calder v. Jones*, 465 U.S. 783 (1984), for the proposition that "[t]he effects of defamation, unlike those of other torts, connect a [non-resident] defendant's conduct to the form [sic], not just to the plaintiff[.]" Docket 10 at 6.

In *Calder,* a California actress brought a libel suit in a California court against a reporter and editor who worked for the National Enquirer in Florida. *Walden*, 571 U.S. at 286-87 (citing *Calder*, 465 U.S. at 785). The article at issue was written in Florida but appeared in California where the Enquirer had a weekly circulation of about 600,000 readers. *Id.* at 287. On appeal, the Supreme Court "examined the various contacts the defendants had created with California (and not just with the plaintiff)" and "found those forum contacts to be ample[.]" *Id.* (first alteration in original). Specifically, the Court found that

> The defendants relied on phone calls to "California sources" for the information in their article; they wrote the story about the plaintiff's activities in California; they caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the State; and the "brunt" of that injury was suffered by the plaintiff in that State. "In sum, California [wa]s the focal point both of the story and of the harm suffered."

*Id.* (quoting *Calder*, 465 U.S. at 788-89) (alteration in original).

*Calder* is distinguishable from Sweetbridge's defamation claim. Here, there is no evidence that the alleged defamatory articles relied on South Dakota sources. There is no evidence that the article discussed Sweetbridge's activities in South

17

Dakota, other than filing this lawsuit here. There is also no evidence that the "brunt" of, or any of, Sweetbridge's alleged injury occurred in South Dakota. The court finds that South Dakota was not the focal point of the story and the harm suffered. Thus, the third factor does not weigh toward the court's jurisdiction over Robinson.

Under the fourth factor, the court acknowledges that every forum state has an interest in providing a forum for its residents. *See K-V Pharm. Co.*, 648 F.3d at 595. But this interest cannot overcome Robinson's due process rights in light of its attenuated contacts with South Dakota, as discussed under factors one, two, and three. The fifth factor—the convenience to the parties—is essentially neutral as it "largely balances out wherever the trial is held." *Id.* Here, a trial in Connecticut would be just as inconvenient for Sweetbridge as a trial in South Dakota would be for Robinson. *See id.* Thus, when considering the contract and the five factors in totality, the court finds that it cannot exercise personal jurisdiction over Robinson.

## II.   Motion to Transfer

Sweetbridge alternatively moves to transfer this case to the United States District Court for the District of Connecticut. Docket 12. Robinson has not responded or objected to the motion to transfer, either separately or in its reply brief to the motion to dismiss. *See* Docket 13. "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Because the court finds that Robinson is "at home" in Connecticut, *supra* at 11, that state has general personal jurisdiction over Robinson. Thus, Sweetbridge's suit could have

18

been brought in Connecticut. Transferring this suit to the District of Connecticut would also serve the convenience of the parties and witnesses and the interest of justice. Sweetbridge's alternative motion to transfer is granted.

## CONCLUSION

The court does not have personal jurisdiction over Robinson, but the case can properly be heard in the District of Connecticut. Thus, it is

ORDERED that Robinson's motion to dismiss (Docket 5) is granted and Sweetbridge's motion to transfer (Docket 12) to the United States District Court for the District of Connecticut is granted.

Dated May 26, 2022.

                                      BY THE COURT:

                                      /s/ *Karen E. Schreier*
                                      KAREN E. SCHREIER
                                      UNITED STATES DISTRICT JUDGE